UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KIMOTHY WALSTON,                          )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )        No. 10-cv-00055 (RCL)
                                         )
FOLEY & LARDNER LLP,                     )        Filed Under Seal
                                         )
        Defendant.                       )
_____  )

## MEMORANDUM OPINION

This case involves allegations of race discrimination and retaliation by a private employer—the law firm of Foley & Lardner LLP. Before the Court is defendant's Motion for Summary Judgment. Def.'s Mot. Summ. J. [13], Dec. 10, 2010. Having carefully considered the motion, the opposition, the reply, the entire record in this case, and the applicable law, the Court will grant defendant's Motion. A review of the background of the case, the governing law, the parties' arguments, and the Court's reasoning in resolving those arguments follows.

## I.     BACKGROUND

Foley & Lardner LLP ("Foley") is a law firm with its headquarters in Milwaukee, Wisconsin. In January 2001, the firm hired Kimothy Walston, an African-American male, as a Technology Supervisor. Def.'s SMF [13-2] ¶¶1, 2. Walston worked at the firm's Washington, D.C. office. *Id.* As a Technology Supervisor, Walston supervised that office's "Technology Specialist" personnel, and was himself managed by a "Regional Technology Manager." Def.'s Ex. 51 [13-8] 1. Walston's responsibilities included troubleshooting hardware and software problems, scheduling the relocation of attorneys and their computer equipment to new offices, and keeping track of the firm's technology inventory—*i.e.*, laptops, telephones, and so on. *Id.*

Foley generally conducts performance reviews of its employees on an annual basis. Def.'s SMF [13-2] ¶2. Beginning in 2004, Walston's first-level supervisor—Paul Lerner—noted a deterioration in his subordinate's job performance. *Id.* ¶¶2–5. Although Lerner gave Walston a rating of "Meets Expectations" in December 2003, the following year this rating was lowered to "Needs Improvement," and Walston was placed on a six-month performance improvement plan. *Id.* ¶¶4, 5. Lerner indicated in Walston's 2004 review that Walston "sometimes experiences difficulty dealing with others," and that he had a "rigid style" that was viewed as "micro-managing." Def.'s Ex. 4 [13-5] 2, 4. Lerner's review, however, also contained many positive comments about Walston. Nevertheless, Walston apparently challenged Lerner's assessment of his performance, but his second-level supervisor—Linda Sanders—agreed with Lerner's evaluation and kept the "Needs Improvement" rating in place. Def.'s Ex. 5 [13-5] 1. In August 2005, Lerner appears to have left the scene, and Walston got a new first-level supervisor—Aaron Wills. Def.'s SMF [13-2] ¶7. Wills, like Walston, is an African-American male. *Id.* The friction between these two gentlemen precipitated the bulk of the complaints and allegations underlying this lawsuit.

Wills' first evaluation of Walston's job performance, in November 2005, was positive; he gave him a rating of "Meets Expectations." *Id.* ¶9; Def.'s Ex. 7 [13-5] 6. However, the following year, that rating plunged to "Unsatisfactory." Def.'s SMF [13-2] ¶10. The 2006 evaluation indicates that it was performed on November 3, 2006. Def.'s Ex. 10 [13-5] 1. On November 6, 2006, a few days after his performance review, Walston sent an e-mail two levels above his supervisor, to Douglas Caddell, the firm's Chief Information Officer. Def.'s Ex. 11 [13-6] 1. Walston requested a meeting with Caddell "in light of the very subjective and inaccurate comments made on my performance appraisal for 2006," and notified him that he would be "returning to [Wills] my 'performance appraisal' with comments . . . ." *Id.*

On November 8, 2006, Walston wrote a seven-page memorandum to Wills, challenging Wills' appraisal of him and disputing most if not all of Wills' conclusions. Def.'s SMF [13-2] ¶11. He even offered his own evaluation of Wills, suggesting that the inadequacies of Wills' evaluation stemmed from his inexperience, and because "[Wills] clearly isn't acquainted with the expectations or culture of the Washington Office." Def.'s Ex. 13 [13-6] 2. Walston also expressed concerns about meetings Wills had apparently been holding with other Foley employees, in which he allegedly asked them about their experiences working with Walston. *Id.* at 3. Walston believed that this showed that an "agenda" was "being formulated" against him. *Id.* He also took issue with Wills' report that the Milwaukee Office thought that the Washington Office was a "black hole" for equipment—*i.e.*, that the office had a reputation for losing or not keeping track of the firm's technology inventory. Walston challenged this assessment, arguing that the Washington Office lacked adequate storage space for equipment. *Id.* While this memo displays all the hallmarks of a garden-variety supervisor–subordinate kerfuffle, nowhere does it indicate that Walston believed he was the victim of discrimination, based upon his African-American race, at the hands of his new African-American supervisor. *Id.* at 1–5; Def.'s SMF [13-2] ¶12.

The next series of incidents began on January 11, 2007, when Walston received a written warning for failing to receive a required technical certification by a certain deadline. Def.'s Ex. 15 [13-6] 1. This written warning was followed in early February 2007 by an e-mail from Wills to Walston, where Wills criticized Walston for failing to follow up with him on a series of tasks. Def.'s Ex. 16 [13-6] 2–3. Walston replied to Wills' e-mail, rejecting his criticisms, and then forwarded the entire exchange to members of Foley's Human Resources department. *Id.* at 1–2. Walston told HR that Wills' critical e-mail was "direct documentation" of how Wills "continues in his attempts to provide a false perception about my work performance to upper management."

*Id.* at 1.  He expressed concerns that Wills was trying to make his "work environment as unpleasant as possible" and force him to quit.  *Id.*  He concluded by asking the HR personnel to "keep this confidential" since "I do not want any retaliatory actions taken against me or my current position."  *Id.*

On February 8, 2007, two days after the above e-mail exchange, Wills sent Walston a new performance review, which was a 90-day follow-up review to his 2006 annual performance review.  Def.'s Ex. 17 [13-6] 1–3.  While Wills noted some areas of improvement in Walston's performance, he wrote that these improvements were "over-shadowed by errors and omissions in what are considered to be simple tasks we perform all the time."  *Id.* at 3.

Less than a week later, it appears that members of Foley's HR staff, alongside Linda Sanders (Walston's second-line supervisor) and Douglas Caddell (Chief Information Officer), began having serious discussions about what to do about Walston.  *See* Def.'s Ex. 18 [13-6] 1.  Sanders, citing his "performance issue[s]," recommended terminating him.  Def.'s Ex. 19 [13-6] 1.  Caddell replied later that same day, stating that he would support replacing Walston with a "Technical Specialist" and that no new Technology Supervisor should be hired for the Washington Office.  Def.'s Ex. 20 [13-6] 1.

While it's unclear whether a final decision to terminate Walston had been reached on February 13, 2007, it appears than any such decision was "off the table" on account of Walston's actions two days later.  *See* Def.'s Ex. 63 [13-8] 54:10–24.  On February 15, 2007, Walston wrote another memorandum, this time to the firm's Chief Human Resources Officer, Marilyn Lagerman.  His memo—titled, "Hostile work environment claim"—described what Walston called the "acrimonious and hostile environment" in the Washington Technology Office and his "fear of retaliatory actions by management . . . ."  Def.'s Ex. 21 [13-7] 1.  The "perpetrator" at the center of this complaint was Wills, whom Walston alleged had displayed "[o]ffensive

behavior," engaged in "[a]cts of intimidation and public humiliation," "[c]reated . . . an oppressive work atmosphere," and behaved in a "hostile, demoralizing[,] and otherwise detrimental" manner. *Id.* Walston presented numerous, and vague, criticisms of Wills' treatment of him, arguing that he discredited his work, threatened his standing as a supervisor, undermined his authority, withheld information, set unrealistic deadlines, overworked him, failed to give him sufficient credit for his work, and set him up to fail. *Id.* Walston also identified a number of areas in which he believed Wills' management style was having an adverse impact on the Washington Office. *Id.* at 2. Walston requested, in the memo, that no "retaliatory actions" be taken against him for his report against Wills, but never alleged that he or anyone else was the victim of race discrimination or that race played any part in the "hostile environment" Wills had allegedly created. *Id.* at 1–2.

After Foley received Walston's complaint, the firm investigated his allegations. This investigation was handled by Dawn Adams, a member of the firm's HR department. Def.'s SMF [13-2] ¶16. Adams' notes indicate that Walston believed that his supervisor's behavior toward him was a "direct response to [Walston's] rebuttals" to his own performance appraisals, but—again—these notes do not reflect that Walston complained that he was being targeted by Wills because of his race. Def.'s Ex. 23 [13-7] 1–5. Foley's HR department concluded its investigation by March 2007, notifying Walston via a memorandum that it was taking corrective action with respect to certain issues presented in his February 2007 complaint and assuring him that it would not permit retaliation against him. Def.'s Ex. 24 [13-7] 1.

Walston's first performance evaluation following his February 2007 complaint was somewhat better than his 2006 evaluation. In November 2007, Wills rated his performance as "Meets Expectations/Needs Improvement." Def.'s SMF [13-2] ¶19. That same month, the firm place Walston on a second performance improvement plan. Def.'s Ex. 29 [13-7] 1. Walston

then lodged another complaint against Wills, in which he alleged that Wills was creating a hostile work environment by falsely suggesting that Walston was not communicating with him enough regarding employees' work-related travel. Def.'s Ex. 32 [13-7] 5. He alleged that Wills' references to communication problems were merely a "tactic" "being used by him as a way to deprive me of an environment free from hostility and retaliation." *Id.* Walston also reported that Wills, during a meeting in which Walston's performance was discussed, told him that he was "delusional" and asked him "what planet" he was "working on." *Id.* at 4. This, Walston claimed, was further evidence that Wills' "severe and pervasive" conduct constituted a "hostile work environment." *Id.*

HR employee Erik Galstad was assigned to investigate Walston's latest complaint. *Id.*; Def.'s SMF [13-2] ¶21. Galstad spoke with Walston on several occasions about his complaint, and prepared a log of those communications. Def.'s SMF [13-2] ¶21. In those notes, Galstad identified the "overarching issue" between Wills and Walston as a difference in "working/personal communication styles," and reasonably opined that Walston "has not accepted that [Wills] is his supervisor . . . ." Def.'s Ex. 29 [13-7] 5. While Galstad viewed some of Wills' comments to Walston as unproductive and inappropriate, he concluded that his actions were not "hostile" in nature. *Id.* at 6. Galstad's notes do not reflect any concern by Walston that Wills' conduct toward him was motivated by Walston's race.

In a "complaint conclusion" memorandum sent to Walston, Galstad notified him that HR's investigation had come to an end, and that he believed that Wills had, at times, behaved inappropriately and that corrective action had been taken by the firm. Def.'s Ex. 34 [13-7] 1. However, Galstad advised Walston that he "need[ed] to respect the position" of Wills as his supervisor. *Id.* This conclusion memorandum was followed-up in September 2008 by a final decision, in which Galstad explained that he had found no instances of retaliatory action taken

against Walston and that nothing that Walston had pointed to constituted hostile conduct.  Def.'s Ex. 42 [13-8] 1.  Galstad then notified Walston that the firm had fully investigated the complaint, and that "[a]t this point my suggestion for you is to move on and act professionally."  *Id.* at 2.

As this act of the Walston–Wills workplace drama drew to close, the U.S. economy, including the legal services sector, took a nosedive, and Foley's management began discussing ways to cut the firm's costs.  Def.'s SMF [13-2] ¶26.  Executive Director Darrell Ohlhauser told the firm's CIO, Douglas Caddell, to cut at least 10 percent of the IT staff.  *Id.* ¶31.  After reviewing his options, Caddell prepared a preliminary list of positions that could be cut.  *Id.* ¶¶32, 33.  Among those positions was Walston's Technology Supervisor position, which was deemed, by Caddell, to be "redundant."[1]  *Id.* ¶¶35, 36.  Ten IT staff, including Walston, were terminated in January 2009.  *Id.*  This first round of layoffs was followed by another, which took place in the fall of 2009.  *Id.* ¶¶39, 40.  An additional twelve employees from the IT department were laid off.  *Id.* ¶41.  In total, Foley laid off 206 employees in 2009.  *Id.* ¶42.

In March 2009, Walston filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging he was the "target of discrimination and abusive hostile work environment because of my race, color, and age by my immediate supervisor."  Pl.'s Ex. EE [18-10] 1.  He also alleged that he was terminated for his complaints about race and age discrimination.  *Id.*  After an investigation, the EEOC determined that it would not pursue Walston's claim, and in February 2010 notified him of his right to sue in federal court.  Walston did so in January 2010.  Compl. [1] 1.  In his Complaint, he brings nine counts, under Section 1981 of the Civil Rights Act of 1991, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the District of Columbia Human Rights Act, D.C. Code § 1-2501 *et seq.*  Am. Compl. [3] ¶1.  Counts I, II, and III are for race discrimination, hostile work

---

[1] It's worth noting as well that Mr. Caddell appears to have wanted to eliminate the Technology Supervisor position in the Washington Office at least since February 2007.  *See* Def.'s Ex. 20 [13-6] 1.

environment, and retaliation, in violation of Section 1981.  *Id.* at 4–6.  Counts IV, V, and VI raise those same counts under the DCHRA, *id.* at 7–10, and  Counts VII, VIII, and IX raise them again under Title VII.  *Id.* at 11–14.[2]

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The standard requires more than the existence of *some* factual dispute: "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (1986).  A fact is material if, under the applicable law, it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Also, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

A non-moving party, however, must establish more than "the existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  Furthermore, it may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). To avoid summary judgment, the non-moving party must present specific facts that could enable a reasonable jury to find in its favor.  *Id.*  However, if the evidence presented is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

---

[2] Mr. Walston has mis-numbered the counts in his Complaint.  While Counts I–V are numbered correctly, Count VI is mistakenly numbered as Count IV; Count VII is mistakenly numbered as Count V; Count VIII is mistakenly numbered as Count VI; and Count IX is mistakenly numbered as Count VII. *See* Am. Compl. [3] 4–14.

## III.   LEGAL STANDARDS

### A. Discrimination

Walston brings three discrimination claims against Foley, under Section 1981, the DCHRA, and Title VII (Counts I, IV, and VII, respectively).  Under each of these laws, in cases where there exists no direct evidence of discrimination, the familiar burden-shifting framework established for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.  *See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 3 (D.C. Cir. 2010); *see also Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011) ("We analyze discrimination claims under the D.C. Human Rights Act in the same way that we analyze discrimination claims under the federal anti-discrimination laws.").  However, where (as here) an "employer has asserted a legitimate, non-discriminatory reason for the decision, . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, sex, or national origin . . . ." *Vatel*, 627 F.3d at 1246 (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

This burden can be met by, *inter alia*, showing that the reason offered by the defendant is false, or by presenting sufficient evidence to permit a reasonable fact-finder to conclude that the employer's proffered explanation is "unworthy of credence." *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 32 (D.D.C. 2009) (citing *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) and *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008)).  However, when the employer's proffered explanation is reasonable in the light of the evidence, "there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts, and summary judgment is appropriate." *Beyah*, 666 F. Supp. 2d at 32 (citations and quotations omitted).

### B. Hostile Work Environment

Walston also brings three claims for a hostile work environment, under Section 1981, the DCHRA, and Title VII (Counts II, V, and VIII).   To make out a claim for a hostile work environment, a plaintiff must demonstrate that he or she was subjected to discriminatory intimidation, ridicule, and insult that was so severe and pervasive that it altered the conditions of his or her employment and created an abusive working environment.   *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).   In addition, the hostile work environment must be the result of discrimination based on a protected status. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (collecting cases).   To determine whether a hostile work environment exists, courts look "to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

### C. Retaliation

Finally, Walston brings three claims for retaliation, under Section 1981, the DCHRA, and Title VII (Counts III, VI, and IX).   To make out a claim for retaliation, a plaintiff must show that he or she engaged in statutorily protected activity, suffered an adverse employment action, and that there is a causal connection between the two.   *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003).   However, as with Walston's discrimination claims, since his former employer has asserted a legitimate, non-retaliatory reason for the termination, Walston must produce sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and the employer in fact intentionally retaliated against him because of his statutorily protected activity. *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).   The only issue, then, is whether the employee's evidence "creates a material dispute on the ultimate issue of retaliation either directly by [showing] that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citations and quotation marks omitted).

## IV.    ANALYSIS

Foley moves for summary judgment on all of Walston's claims.  Def.'s Mot. Summ. J. [13-1] 2.  As to his discrimination claims, Foley argues that Walston has no evidence that his termination was based on race and that he has failed to rebut the firm's proffer that recession-driven cost-cutting led to his termination.  *Id.*  As to his hostile work environment claims, Foley argues that Walston's evidence demonstrates "mere workplace disagreements," not the severe and pervasive conduct required to show a hostile work environment.  *Id.*  Finally, as to his retaliation claims, the firm argues that he has failed to establish a *prima facie* case of retaliation and to rebut the firm's proffer that budget constraints—not retaliation—motived his termination. *Id.* at 3.  Walston counters that summary judgment is inappropriate because a reasonable jury could conclude that the firm's proffer is merely a pretext for prohibited retaliation, and that he has presented sufficient evidence to establish his claims for a hostile work environment based on race.  Pl.'s Opp'n [18] 24, 25–31.  The Court will discuss these and other arguments in the analysis that follows.

### A.  Counts I, IV, and VII: Discrimination

Each of Walston's discrimination claims will be dismissed because he has failed to present any evidence, or even any argument, that he was terminated because of his race.  The "argument" section of his Opposition focuses exclusively on his contention that he was retaliated against for protected activity and that he was the victim of a hostile work environment.  *See* Pl.'s Opp'n [18] 22–31.  When a party files an opposition addressing only certain arguments raised in a dispositive motion, a court may treat those argument that the non-moving party failed to address as conceded.  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d

174, 178 (D.D.C. 2002) (discussing Local Civil Rule 7.1(b)).  Walston has failed to address Foley's arguments and supporting evidence challenging the allegations in his complaint that he was terminated because of his race, and he has therefore conceded those claims.

Mindful of the harshness of this result, the Court has carefully reviewed the entire record to determine whether Walston's failure to support his discrimination claims was a mere oversight and whether evidence sufficient to avoid summary judgment as to these claims in fact exists. However, such evidence is absent.  In Walston's deposition, he was asked the basis for his claim that he was terminated based on his race, yet he focused in his answer on the actions of Wills, even though Wills did not make the decision to eliminate Walston's position.  *See* Pl.'s Ex. B [18-3] 67:6–68:16.  Furthermore, there is no evidence that the person who actually made that decision—CIO Douglas Caddell—made it because of Walston's race, and abundant evidence that Walston's performance issues and cost-reduction considerations were the actual reasons for his termination.  *See, e.g.*, Caddell Aff. [13-3] ¶9; Def.'s Ex. 48 [13-8] 2; Def.'s Ex. 62 [13-8] 111:4–12, 128:16–24; Def.'s Ex. 55 [13-8] 2.  The Court finds no evidence suggesting that Foley is lying about the underlying facts, and no evidence that could convince a reasonable jury that intentional discrimination was the actual reason for his termination.  As such, summary judgment is appropriate.  *See Beyah*, 666 F. Supp. 2d at 32.

In sum, Walston has not only conceded his discrimination claims, but he has failed to carry his summary-judgment burden to present specific facts that could enable a reasonable jury to find in his favor with respect to his discrimination claims.  For these reasons, the Court will grant Foley's Motion for Summary Judgment as to Counts I, IV, and VII of Walston's Complaint.

**B. Counts II, V, and VIII: Hostile Work Environment**

Walston's hostile work environment claims will be dismissed for two independent reasons. First, there is no evidence—direct or circumstantial—that the conduct Walston complained of while he was supervised by Aaron Wills was motivated by his race. Second, that conduct does not meet the legal standard of conduct so "severe and pervasive" that it alters the conditions of employment and creates an abusive working environment. *Oncale*, 523 U.S. at 81.

Regarding the first point, it is Walston's burden on summary judgment to show the Court some evidence that could convince a reasonable jury that he was the victim of *discriminatory* conduct—that is, conduct based upon his African-American race. *See Lester*, 290 F. Supp. 2d at 22. Apart from his unsupported speculations, Walston's sole evidence on this issue is his deposition testimony that Wills called the Washington Office a "black hole." Pl.'s Ex. B [18-3] 45:8–15; 116:2–9. However, the record indicates that, before this lawsuit, Walston never represented to anyone that he believed that the phrase "black hole" was a racial reference rather than a reference to the Washington Office's propensity for losing equipment. In a memo from 2006, discussed above, where Walston first reports Wills' "black hole" comments, Walston provides no indication that the phrase related to anything other than the Washington Office's inventory problems:

> In response to the statement "More than a dozen T40 laptops shipped from DC to Milwaukee remain missing," this statement is totally false. I have shown [Wills] copies of manual air bills that show the FedEx tracking numbers, the name and address of the receiver, the name of the person who received the boxes in Milwaukee along with the date and time received. If there is a problem with receiving shipments and tracking of equipment in Milwaukee those problems should not be reflected in my evaluation. I explained to [Wills] that the firm's tool for tracking equipment . . . has historically and consistently produced incorrect data, this is why I conduct a manual inventory for all projects assigned to the region. *[Wills] constantly states that "Milwaukee" thinks that the Washington Office is a "black hole" for equipment.* We do not have an adequate storage facility and are storing equipment in two closets. So if there is a "black

> hole" I would like to have "Milwaukee" visit our office and clarify what they
> mean by a "black hole."

Def.'s Ex. 13 [13-6] 5 (emphasis added). Walston's writing in this memo is crystal clear: he was

told by Wills that the Milwaukee Office believed that the Washington Office was a "black hole"

"*for equipment*." Furthermore, the only other references to this "black hole" comment that this

Court could find in the record entirely undercut Walston's current, self-serving characterization

of that phrase. *See, e.g.*, Pl.'s Ex. E [18-7] 46:19–48:17; Def.'s Ex. 57 [13-8] 1; Def.'s Ex. 31

[13-7] 1.

Even during Walston's deposition in this lawsuit, he avoided directly answering the

question of whether he actually believed that Wills' "black hole" comments were racial

references, stating only that "I believe it does have the propensity to be categorized as a racist

comment." Pl.'s Ex. B [18-3] 46:3–8. What matters, however, is not whether a phrase, severed

from its contemporaneous context, has the "propensity to be categorized" as race-based; what

matters is whether it was *in fact* intended to be a comment about Walston's race, which is

suggested by no evidence, other than Walston's self-serving (and contradictory) testimony. As

the D.C. Circuit has held, summary judgment "is most likely when a plaintiff's claim is

supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating

evidence, and undermined either by other credible evidence, physical impossibility or other

persuasive evidence . . . ." *Arrington v. U.S.*, 473 F.3d 329, 342–43 (D.C. Cir. 2006) (quoting

*Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989)). Such is

the case here. Therefore, Walston hasn't met his burden to present sufficient evidence to convince a

reasonable jury that his employer's conduct was discriminatory. While he "may have worked in

an imperfect office with some flawed characters, without connecting [his] employer's actions

with intent to discriminate . . . on the basis of . . . race, [he] cannot escape summary judgment." *Hendricks v. Geithner*, 568 F.3d 1008, 1014 (D.C. Cir. 2009).

Walston's hostile work environment claims also fail because the conduct he has complained about does not meet the legal standard of conduct so severe and pervasive that it alters the conditions of his employment and creates an abusive working environment. Walston has the burden of presenting specific facts upon which a reasonable jury could conclude that his workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . ." *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (quotations and citations omitted). Setting aside the obvious problem that there is no evidence of *discriminatory* conduct whose "frequency," "severity," and "offensiveness" this Court can evaluate, *see Baloch*, 550 F.3d at 1202, the conduct complained of by Walston, taken together and viewed objectively, was not severe, offensive, hostile, or abusive.

Walston points to the following examples[3] to substantiate his hostile work environment claims:

1. Wills' reports to Walston that others were critical of Walston's performance and the performance of the Washington technology office generally. Pl.'s Ex. B [18-3] 60:4–62:4.

2. An incident where Wills faulted Walston for a power outage and told other Foley employees that Walston had "dropped the ball." *Id.* 97:18–98:19; 216:7–14.

3. Wills' sending Walston e-mails when he was on vacation, and then questioning him about them when he returned from vacation. *Id.* 125:3–6; 189:8–12.

4. Wills' failure to invite him to "at least four" meetings of the Washington technology team. *Id.* 156:10–18.

5. Wills' questioning of Walston's "arrival times at locations when I was on site." *Id.* 189:20–21.

---

[3] The Court excludes from the list obviously inadmissible hearsay evidence, such as Walston's testimony concerning what others said Wills did or told them. *See, e.g.*, Pl.'s Ex. B [18-3] 59:7–11.

6. Wills' asking him to do things that Walston believed could not completed within the given deadline. *Id.* 203:2–4.

7. Wills' refusal to respond to Walston's request for compensation for his having worked "in excess of 50 to 60 hours a week" for an extended period, even though Walston's position was "exempt" from federal overtime regulations. *Id.* at 215:3–22.

8. Wills' telling Walston that twelve laptops shipped from the Washington Office to Milwaukee had gone missing, despite Walston's belief that these laptops were not missing. *Id.* 258:4–21.

9. Wills' telling Walston that there was "no need" for Walston to speak with Linda Sanders or Doug Caddell about Wills' discussions with other employees about Walston's work performance. *Id.* 123:18–22; 175:7–18.

10. Wills' use of a "curt" or "condescending" tone with Walston, interrupting him in meetings, and "roll[ing] his eyes" when Walston spoke. *Id.* 175:22–176:21; 181:3–6.

11. Wills' being "unresponsive" to Walston's questions raised in e-mails. *Id.* 179:10–18.

12. Wills' failure to provide Walston with sufficient "positive feedback." *Id.* 203:13–19.

13. Wills' telling Walston that the Milwaukee Office considered the Washington Office to be a "black hole" for equipment. Def.'s Ex. 13 [13-6] 5.

14. Wills' calling Walston "delusional" and asking him whether he was from another planet. Pl.'s Ex. B [18-3] 130:6–9.

15. Wills' performing evaluations of Walston that were critical of his job performance. Pl.'s Opp'n [19] 28.

These various instances of alleged misconduct, taken together, do not rise to the level of "extreme" conduct that "amount[s] to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Courts in this Circuit have routinely rejected hostile work environment claims in these circumstances—that is, a subordinate and a supervisor frequently butting heads. *See, e.g., Franklin v. Potter*, 600 F. Supp. 2d 38, 78 (D.D.C. 2009); *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004). Anti-discrimination statutes are not "general civility code[s]" that permit recovery for "ordinary tribulations of the workplace."

*Faragher*, 524 U.S. at 788 (citations and quotations omitted). Walston's evidence shows nothing more than an ordinary workplace squabble between a subordinate who didn't trust his supervisor's judgment, and a supervisor who didn't think his subordinate's performance was adequate. As such, Walston's hostile work environment claims fail.

Therefore, for the reasons stated above, Foley's Motion for Summary Judgment will be granted as to Counts II, V, and VIII of Walston's Complaint.

## C. Counts III, VI, and IX: Retaliation

With regard to Walston's retaliation claims, these claims will be dismissed because Walston has failed to produce sufficient evidence for a reasonable jury to find that Foley's asserted, non-retaliatory reason for his termination wasn't the real reason and that Foley actually terminated him because he engaged in statutorily protected activity. *See Jones*, 557 F.3d at 678. Nothing Walston presents suggests either that a retaliatory reason motivated Foley or that the reasons Foley has put forward—cost containment and Walston's performance issues—shouldn't be credited. *See id.*

Foley has explained that Walston was terminated in January 2009 as part of the firm's efforts to cut costs during the recession. Def.'s Mot. Summ. J. [13-1] 39. Dozens of IT employees were let go during this process, and layoffs were determined based on management's conclusions about which positions were essential, combined with a consideration of individual employees' performance. *Id.* Foley has offered evidence indicating that as early as February 2007, the firm's CIO, Douglas Caddell, viewed Walston's Technology Supervisor position as unnecessary. Def.'s Ex. 20 [13-6] 1. It is undisputed that Walston received evaluations critical of his job performance both prior to the arrival of Aaron Wills and after. *See* Def.'s SMF [13-2] ¶¶5, 6, 10, 13, 18, 19, 23, 25. It is undisputed that, beginning in the Summer of 2008, Foley began responding to the financial pressures imposed on the firm by the recession and charged its

CIO with cutting ten percent of his staff. *Id.* ¶¶ 26, 31. Ultimately, 206 Foley employees were laid off, including 22 employees in the IT department. *Id.* ¶¶ 36, 41, 42. Walston's burden, unmet in this case, is to present specific facts that suggest that Foley is lying and that his termination was in fact pay-back for statutorily protected conduct. *See Beyah*, 666 F. Supp. 2d at 32.

Walston doesn't dispute that "cost[-]saving measures forced [Foley] to freeze hiring, eliminate positions[,] and even terminate some technology employees." Pl.'s Opp'n [18] 24. However, he claims that a reasonable jury could conclude that, as to his specific termination, cost-containment is a pretext. *Id.*

First, Walston claims that Foley's explanation for his termination does not square with a certain staffing decision the firm made around the time that he was let go. Pl.'s Opp'n [18] 25. In particular, he points out that while the firm was in the process of eliminating his Technology Supervisor position, it was "listing a position for a [T]echnology [S]pecialist in D.C. on Craigslist." *Id.* at 20. This argument has no merit. The firm's decision to fill a single position with a different title, substantially lower pay, and different responsibilities than Walston's Technology Supervisor position is irrelevant to its decision to eliminate his position. Furthermore, when he was laid off, so were nine others, with an additional twelve IT department layoffs occurring several months later. Def.'s SMF [13-2] ¶¶36, 40, 41. Foley's hiring of a Technology *Specialist* is perfectly consistent with its contention that the firm had determined, as early as February 2007, that his Technology *Supervisor* position was unnecessary. Therefore Walston hasn't presented evidence that calls into question Foley's claim that cost reduction drove his termination.

Walston also suggests that cost containment could not be the true reason for his termination because, he says, he was the "*only* Foley employee terminated during this process

who was *not* in the Milwaukee office." Pl.'s Opp'n [18] 26.  While the Court is not entirely clear about what this fact truly suggests, it is clear that it doesn't suggest that Foley's explanation for Walston's termination is a pretext for statutorily protected activity.  Walston's termination is consistent with his poor performance reviews along with ample evidence indicating that high-level managers sought to eliminate the Technology Supervisor position across all of its offices, with the exception of its largest office in Milwaukee.  Caddell Aff. [13-3] ¶¶8–12.

The record does provide evidence that could convince a reasonable jury that he was *not* fired in 2007 because he complained of a hostile work environment, *see, e.g.*, Def.'s Ex. 63 [13-8] 54:10–24, but remaining employed is (obviously) not an adverse employment action for purposes of the anti-retaliation statutes.  In sum, Walston has not only failed to poke any holes in Foley's explanation for his termination, but he has also failed to present any evidence that could lead a reasonable jury to conclude that he was actually laid off because he complained about statutorily protected activity.

In addition to Walston's failure to meet his burden under *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009), Walston has failed to raise a genuine issue of material fact regarding all of the essential elements of his retaliation claims.  As presented above, to make out a claim for retaliation, Walston must show that he (1) engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that there is a causal connection between the two.  *Taylor*, 350 F.3d at 1292.  There is no dispute that his termination constitutes an adverse employment action; Foley submits, however, that Walston has no evidence that he engaged in statutorily protected activity or that a causal link connects such activity and his termination.  Def.'s Mot. Summ. J. [13-1] 37, 40.  The Court agrees.

Not every workplace complaint entitles an employee to the protection of anti-retaliation statutes.  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  "While no 'magic

words' are required, the complaint must in some way allege unlawful discrimination,'—that is, discrimination on the basis of a protected characteristic." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 89 (D.D.C. 2010).   Therefore, Walston's burden, in opposing Foley's Motion for Summary Judgment, is to present some evidence upon which a reasonable jury could conclude that he complained about discrimination based upon his membership in a protected class. However, there is no evidence that in any of Walston's contemporaneous complaints to HR or others that he referred to his race or suggested that anyone else's conduct toward him related to his race.   When an employee makes generic claims about "harassment" in a workplace grievance, without referencing race, gender, or any other protected category, courts generally have held that such complaints do not constitute statutorily protected activity.  *See Beyene v. Hilton Hotels Corp.*, No. 08-01972, 2011 WL 4527066, at *6–7 (D.D.C. Sept. 30, 2011) (collecting cases).

Likewise, Walston has failed to present evidence suggesting that a causal link connects his termination to his complaints about the "hostile work environment" his supervisor was allegedly creating.   A causal link can be established with direct evidence, or circumstantially— for example, with a showing that an adverse employment action took place shortly after statutorily protected activity.  *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).   There is no question that the nearly two-year gap separating Walston's first "hostile work environment" complaint in February 2007 and his January 2009 termination is far too great to provide any basis for inferring a causal link between the two.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).   The more than one-year gap between his second complaint and his termination likewise fails to give rise to any inference.   Walston provides no other evidence or argument that could establish a connection between his complaints about Wills' conduct and the firm's ultimate decision to lay him off.

For these reasons, the Court will grant Foley's Motion for Summary Judgment as to Counts III, VI, and IX of Walston's Complaint.

## V.      CONCLUSION

Therefore, for the reasons stated above, the Court will grant defendant's Motion [13] for Summary Judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Date: _____1/23/12_____          _____
                                      ROYCE C. LAMBERTH
                                      United States District Judge